UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Docket No. 1:12-cr-133-jgm-5 |
| | : | |
| JOHN STONE, | : | |
| | : | |
| Defendant. | : | |
| _____: | | |

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS
(Doc. 69)

I.  Introduction

The Government has charged the Defendant, John Stone, with violating 21 U.S.C. §§ 846, 841(c)(2) by conspiring to possess and distribute pseudoephedrine for use in manufacturing methamphetamine.  (Doc. 35 at 4.)  The Defendant has moved to suppress statements he made to government agents during an interview on October 24, 2012.  (Doc. 69 at 1.)  He alleges the agents: (1) failed to advise him of his rights under Miranda v. Arizona, 348 U.S. 436 (1966), and (2) coerced involuntary statements from him.  Id.  The Government has opposed his motion.  (Doc. 75.)  The Court held an evidentiary hearing on July 29, 2013.  (Doc. 79.)

II.  Factual Background

   A.  Witness Credibility

At the evidentiary hearing, Detective Shawn Loan of the Vermont State Police ("VSP") and the Defendant testified.  They provided contrasting accounts of the October 24th interview, including whether Detective Loan and a Drug Enforcement Administration ("DEA") diversion investigator, Christopher Paquette, threatened to arrest the Defendant if he did not talk with

them.  During much of his testimony, the Defendant appeared evasive and calculating.  His demeanor contrasted with Detective Loan, who testified confidently in a straightforward manner.  The Defendant also has an extensive criminal history, including approximately nine felony convictions.  As a criminal defendant, the Defendant has a strong motivation to offer self-serving testimony.  Based on observations of both witnesses at the hearing, Detective Loan's more consistent narrative, and Defendant's criminal history and motivation, the Court finds Detective Loan more credible and adopts his account of the interview.  Notwithstanding its doubts about his credibility, the Court has incorporated portions of the Defendant's testimony into its findings.

      B.      Factual Findings

Detective Loan led an investigation by the Northeast Drug Task Force of co-defendants Thaddeus Gordon and Shawn Greenwood in 2012.  He suspected them of manufacturing and selling methamphetamine in northern Vermont.  Methamphetamine is a controlled substance under federal law.  21 C.F.R. § 1308(d)(2).  Two of its ingredients–ephedrine and pseudoephedrine–may be purchased at pharmacies.  The DEA has classified these chemicals as "listed chemicals."  See 21 C.F.R. §§ 1310.02(a)(3), (11).  18 U.S.C. § 841(c)(2) prohibits the purchase of a "listed chemical" with "knowledge, or having reasonable cause to believe, that . . . [it] will be used" to make a controlled substance.

As the investigation progressed, Detective Loan discovered that Mr. Gordon had lived in the same apartment as Stephanie Grant.  He also learned that the Defendant was Ms. Grant's boyfriend.  Aware of this connection between the Defendant and Mr. Gordon, Detective Loan reviewed various pharmacy records for patterns of similar purchases by the Defendant, Ms. Grant, Mr. Gordon, and Mr. Greenwood.  He discovered they had all purchased pseudoephedrine on the same day.  Based on the timing of these purchases and the Defendant's connection to Mr.

Gordon's apartment, Detective Loan decided to interview the Defendant. He believed the Defendant might be a witness or a possible suspect. His status was undetermined.

Detective Loan and Investigator Paquette (together, "the agents") interviewed the Defendant on October 24, 2012 at his residence in St. Johnsbury, Vermont. At the time, the Defendant lived with multiple roommates in a single-family house. The agents drove to the house in the afternoon and parked in its driveway. They walked around the house to its back porch, which is elevated about a story off the ground, around three to four feet wide, and spans the rear of the building. See Ex. B, B1, B2. The porch had bicycles, boxes, and other items on it, including chairs. Detective Loan was wearing jeans and a hooded sweatshirt and carried a badge and a firearm concealed underneath his sweatshirt. Investigator Paquette was also in plain clothes. The record does not establish whether he was carrying a firearm. Both agents carried handcuffs.

Detective Loan knocked on the back porch screen door. An older male appeared in the doorway, and the agents asked to speak with the Defendant. When the Defendant came to the door, the agents identified themselves, showed him their badges, and asked to speak with him about Mr. Greenwood and Mr. Gordon. The Defendant replied, "I don't like cops." Detective Loan responded that they would still like to talk with him because he had witnessed a crime. Detective Loan also made it clear they wished to understand the extent of the Defendant's involvement. At this point in the conversation, the Defendant had his back to the door and was standing between the agents, who were about two feet away.[1]

---

[1] Based on these positions, the Defendant testified that he did not feel free to leave because the agents had the exits blocked. This testimony is inconsistent. It is impossible for the two agents to have blocked all the exits if the Defendant had his back to the porch door.

The Defendant informed the agents that he would prefer to step away from the porch door because other residents might overhear his conversation. Detective Loan asked whether he wanted to go to the barracks to talk. The Defendant declined his offer, proposing instead that they speak on the porch. The agents did not threaten to take the Defendant to the barracks if he declined to talk with them.[2] Nor did they make any promises to him. Rather, the agents explained that they would relay any information he provided to the United States Attorney's Office, which would then decide whether to treat him as a witness or a defendant. The agents also informed the Defendant that he was not under arrest, they were not there to arrest him, and he was under no obligation to talk with them.

The Defendant began to smoke near a "no smoking" sign on the porch. Investigator Paquette remarked that he would appreciate it if the Defendant did not smoke there. This remark upset the Defendant, causing Investigator Paquette to step away from him. Detective Loan conducted the remainder of the interview, with Investigator Paquette taking notes. The Defendant took a seat on a chair about half-way down the porch. In an effort to stay at eye-level, Detective Loan knelt next to the Defendant. Investigator Paquette remained standing, about four feet from the Defendant, who was seated between the agents. Investigator Paquette was closest to both the screen door and the exterior entrance to the porch. To leave the porch, the Defendant would have had to walk around Investigator Paquette.

The Defendant again informed the agents that he did not like police. He explained he had recently finished up a stint in jail and boasted that he had beat up a VSP higher-up. As the interview progressed, the Defendant calmed down. During it, he never informed the agents that he did not

---

[2] To be clear, the Court does not credit the Defendant's testimony that the agents threatened to take him to the police barracks unless he calmed down and cooperated. The Court also does not credit his testimony that he observed Investigator Paquette reach behind his back for handcuffs. Nor does the Court credit the Defendant's testimony that he only spoke with the agents after they promised not to arrest him if he talked with them.

want to talk to them.  Nor did he refuse to talk with them or ask them to leave.  The agents never informed the Defendant that he could not leave the porch.  Nor did they pat him down.  Detective Loan testified the agents would have left, had the Defendant asked them to do so.  The interview lasted about thirty-minutes.  The agents did not administer Miranda warnings during it.

III.    Discussion

    A.    Miranda v. Arizona

The Defendant and the Government dispute whether the agents placed the Defendant "in custody," thereby triggering Miranda's prophylactic warnings.  United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011).  The Defendant contends the agents placed him in custody on the porch; the Government contends otherwise.  (Doc. 69-1 at 2-3; Doc. 75 at 2-3.)  Considering the circumstances surrounding the interview, the Court concludes that the Defendant was not in custody.  Miranda does not bar the admission of the statements he made to the agents on October 24, 2013.  FNU LNU, 653 F.3d at 148.

A suspect is "in custody" for Miranda purposes if there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (internal quotations omitted).  "Two discrete inquiries are essential to this determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[.]"  Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  The test for whether a suspect is in custody is not subjective; it depends instead "on how a reasonable person in the suspect's position would view the situation." FNU LNU, 653 F.3d at 151.  A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation. See United States v. Cunningham, No. 11-CR-65, 2012 WL 369923, at *3 (D. Vt. Feb. 3, 2012).

To determine whether a suspect is in custody, a court must "examine all of the circumstances surrounding the interrogation." J.D.B., 131 S. Ct. at 2402 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)).  These circumstances include, inter alia:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . . .

FNU LNU, 653 F.3d at 151 (internal quotations and citations omitted).

The Defendant has not established he was in custody for Miranda purposes.  First, the agents interrogated him on the porch of his apartment.  The courts "almost universally hold that questioning in a suspect's home is not custodial."  United States v. Zuber, No. 2:12-cr-00045, 2013 WL 3873178, at *6 (D. Vt. July 25, 2013) (internal quotations omitted).  The agents conducted the interview in plain clothes, with no firearms drawn or visible.  Nor did they handcuff the Defendant during the interview.  United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004) (describing "[h]andcuffs . . . as a hallmark of a formal arrest").  The agents also informed the Defendant that he was not under arrest–another factor which weighs against a custody finding.  Id.  In addition, they made it clear that he was not obligated to speak with them and could terminate the interview at any time.  The thirty-minute interview was not a "marathon session designed to force a confession."  Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (two-hour interrogation non-custodial).

The Court recognizes that the agents somewhat restrained the Defendant's freedom of movement once he moved away from the porch door.  At this point, Investigator Paquette blocked the Defendant's only exit from the cluttered, elevated porch.  But Investigator Paquette also stood about four feet from the Defendant, with Detective Loan kneeling by his chair.  The agents did not position themselves around the Defendant in an intimidating manner.  Furthermore, the Supreme

Court has declined "to accord talismanic power to the freedom-of-movement inquiry and ha[s] instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes v. Fields, 132 S. Ct. 1181, 1189-90 (2012) (internal quotations omitted). Having examined the circumstances surrounding the interview on the porch, the Court concludes that a reasonable person would have felt free to terminate the questioning and ask the agents to leave. The Defendant was not in custody during the interview. There was no Miranda violation.

      B.      Voluntariness

The Defendant asserts that the agents coerced involuntary statements from him. (Doc. 69 at 1.) A confession is involuntary and thus violates the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment if "a defendant's will was overborne by the circumstances surrounding [it]." Dickerson v. United States, 530 U.S. 428, 434 (2000) (internal quotations omitted). In applying this totality of the circumstances test, the courts consider: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Green v. Scully, 850 F.2d 894, 901-02 (2d Cir. 1988). The Government bears the burden of proving the voluntariness of a defendant's confession. United States v. Orlandez–Gamboa, 320 F.3d 328, 333 (2d Cir. 2003).

The Government has shown the Defendant's will was not overborne by the agents. The relevant characteristics of the accused are his or her "experience and background, together with the suspect's youth and lack of education or intelligence." Green, 850 F.2d at 902. A court should consider in particular whether the accused is "a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice." United States v. Watson, 423 U.S. 411, 424-25 (1976). The Defendant is middle-aged, has a lengthy criminal record, and

testified articulately at the suppression hearing. There also was no indication at the hearing that he is unable to exercise his free will. His individual characteristics do not support an involuntariness finding.

The conditions of the interview and the conduct of the agents also weigh against such a finding. Two law enforcement agents interviewed the Defendant on his porch for about thirty-minutes. The agents never promised the Defendant leniency or physically mistreated him. Green, 850 F.3d at 901. They did not handcuff him, nor did they draw firearms. Notwithstanding the lack of counsel and Miranda warnings at the interview, see id., the Government has shown the Defendant's will was not overborne by the totality of circumstances surrounding the interview.

IV.    Conclusion

For the above reasons, the Defendant's motion to suppress is DENIED. A pretrial conference will be scheduled in October, 2013.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 18th day of September, 2013.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge